RECEIVED

JUN - 1 2012

U.S. DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

DEPUTY CLERK

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| MARUCCI SPORTS, L.L.C. | CIVIL ACTION NUMBER: 12-223-BAJ |
| versus | JUDGE:   Brian A. Jackson |
| THE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, THE NATIONAL FEDERATION OF STATE HIGH SCHOOL ASSOCIATIONS & WASHINGTON STATE UNIVERSITY | MAGISTRATE:  Stephen C. Riedlinger |
| | FILED UNDER SEAL |

---

### SECOND AMENDED & RESTATED COMPLAINT

---

In this Second Amended and Restated Complaint against the National Collegiate Athletic Association (NCAA) and The National Federation of State High School Associations (NFHS) (collectively, "Defendants"), Marucci Sports, L.L.C. (Marucci") seeks injunctive relief and damages and respectfully represents as follows:

#### INTRODUCTION

1.     Beginning in 2011, the NCAA and NFHS began enforcing a standard restricting the use of aluminum and composite baseball bats in baseball games sanctioned by the NCAA and NFHS to those certified by WSU as having a Bat-Ball Coefficient of Restitution (BBCOR) of 0.500 or less (the BBCOR Standard).   In 2010, Marucci submitted several baseball bat models to WSU for testing under the BBCOR Standard.  WSU certified the models submitted by Marucci, and based on this certification, Marucci invested millions of dollars in the production and promotion of its aluminum baseball bats for use in NCAA and NFHS sanctioned events. Because of the superior performance and design of the BBCOR certified bats manufactured by Marucci, numerous players and schools selected Marucci's bats over the baseball bats of large, well

{B0800923.1}                                                  1

established baseball bat manufacturers such as Easton-Bell Sports, Inc. ("Easton"), DeMarini Sports, Inc. ("DeMarini"), Hillerich & Bradsby Co. ("Louisville Slugger"), and Rawlings Sporting Goods Company, Inc. ("Rawlings") (collectively, the "Incumbent Manufacturers").

2.      The NCAA and its member colleges and universities, collectively receive millions of dollars in licensing fees, royalty payments, and/or promotional fees from the Incumbent Manufacturers.  Colleges and universities and their coaches also receive substantial financial payments from Incumbent Manufacturers by agreeing to utilize their equipment and apparel in all games.  WSU markets itself as a service provider for measuring and testing baseball bat performance.  It receives hundreds of thousands of dollars annually from Incumbent Manufacturers for testing services ordered by the Incumbent Manufacturers.  WSU relies on these fees to maintain and profit from its certification operations.  The director of WSU also has established one or more businesses through which he markets baseball bat performance testing equipment and software.  Incumbent Manufacturers are his largest customers.

3.      In order to continue receiving payments from the Incumbent Manufacturers, the NCAA and WSU treat Incumbent Manufacturers differently than Marucci and other new entrants with respect to their enforcement of the BBCOR Standard.  For example, in 2011, Rawlings paid hundreds of thousands of dollars to the NCAA in order to be a sponsor for the College World Series.  Upon information and belief, prior to the College World Series, the NCAA and WSU had received evidence demonstrating that the Rawlings 5150 model bat did not meet the BBCOR Standard.  The NCAA, nevertheless, took no action against the Rawlings 5150 model in order to protect its relationship with Rawlings.  Its failure to do so has raised serious questions about the integrity of the 2011 College World Series because the winning team

utilized the Rawlings 5150 model bat. Subsequently, tests conducted by WSU in 2012 evidenced the noncompliance of the Rawlings 5150 model.

4.      By contrast, the NCAA and WSU are quick to take action to disqualify bats manufactured by Marucci and other new entrants in order to protect the substantial market shares held by Incumbent Manufacturers even if it means rigging their tests to do so. For example, upon information and belief, the NCAA recently directed WSU to conduct further compliance tests of Marucci bats in response to the concerns of the Incumbent Manufacturers regarding Marucci's success in the market. In violation of the BBCOR Standard, NCAA and WSU failed to ensure that the bats tested constituted a representative sample of bats in NCAA competition and, more significantly, used unreliable data to assert that the Marucci bats exceeded the 0.500 BBCOR Standard, Among other things, the NCAA and WSU knew that beyond the second decimal place the results of the BBCOR calculations performed by WSU were inherently uncertain and did not provide reliable information with respect to bat performance or player safety and that the Marucci bats would not have exceeded the .500 threshold for certification if the third and fourth decimals were disregarded as they should have been. The NCAA and WSU also knew at all times that Marucci bats were as safe as any other bat certified under the BBCOR Standard and that the certified bats of Incumbent Manufacturers would fail the BBCOR Standard if WSU applied the same protocols and methodologies to their bats.

5.      On the opening day of the 2012 baseball season, the NCAA announced that it had decertified one of Marucci's BBCOR certified bat models. The NCAA subsequently informed Marucci that it intended to decertify several additional Marucci bat models. The NCAA took

these steps in concert with its member institutions, the NFHS and its member institutions, and WSU with the effect of insulating the Incumbent Manufacturers from competition and protecting their respective financial interests in the millions of dollars in payments they receive from Incumbent Manufacturers. The NCAA also took these step knowing that Marucci would not be able to effectively introduce new BBCOR certified bats in a timely fashion, that Marucci would suffer the greatest harm to its goodwill and reputation among players and retailers if its bats were decertified at the beginning of the baseball season, and that thousands of players and hundreds of retailers who had purchased Marucci bats would be unlikely to select Marucci bats in the future due to the risk of further decertifications.

6.      Competition will be harmed by the NCAA's continued arbitrary and capricious enforcement of the BBCOR Standard because consumers are being denied their first, best choice for baseball bats (i.e., Marucci) without any benefit to player safety or competition. To the contrary, if collegiate and high school players are forced to abandon Marucci bats, they will be playing baseball games at a significant competitive disadvantage over other players because they have invested hundreds of hours practicing with Marucci bats and have less confidence in other bats. The ability of players to use their bat of choice will affect their performance which in turn will affect the placement of their teams in conference leagues and playoffs. Individual performance also affects the likelihood that a player will be drafted and, if drafted, their placement within the draft. Not only will consumers have fewer options, the absence of competition will eliminate the price competition and performance advances generated by the success of new entrants like Marucci.

{B0800923.1}                                          4

7.     The conduct described above violates federal and state laws prohibiting unreasonable restraints of trade, unfair trade practices, product disparagement, and other tortious conduct.   For these reasons, and as more specifically set forth below, Marucci is entitled to permanent injunctive relief and recovery of the damages it has suffered as a result of the wrongful decertifications and threatened decertifications of Marucci bats based on the enforcement of the BBCOR standard beyond the limits of its precisions.

## DEFENDANTS

8.     NCAA is an unincorporated association comprised on numerous colleges and universities which participate in inter-collegiate sports activities.   NCAA and its member institutions generate revenue by licensing rights in their trademarks and sporting events and by entering into exclusive contracts with equipment and apparel manufacturers.

9.     NFHS is an unincorporated association that regulates participation in athletic programs in more than 15,000 high schools in all fifty states.   NFHS and its member institutions generate revenue through the same type of licensing transactions as the NCAA.

## JURISDICTION

10.    This Court possesses subject matter jurisdiction over the present matter pursuant to the Sherman Antitrust Act, 15 U.S.C. §§ 1 & 16 and 28 U.S.C. § 1331.

## VENUE

11.    This Court is a proper venue for this matter pursuant to 15 U.S.C. § 15 because the NCAA and NFHS are unincorporated associations with members in this district.  Further, the combination or conspiracy of the NCAA and NFHS conducts a substantial part of their activities in this district including but not limited to the regulation of the use of aluminum bats in NCAA

and NFHS competition in this district.  This Court is also a proper venue for the present matter pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Marucci's claims occurred in this district including the regulation of the use of aluminum bats in NCAA and NFHS competition in this district and its attendant anti-competitive effects on the aluminum baseball bat market in this district.   Additionally, Marucci has sustained and will continue to sustain significant damages in this district.

## ALLEGATIONS OF FACT

12.      Collegiate and high school baseball players utilize aluminum or composite bats in NCAA and NFHS sanctioned baseball games because they believe aluminum and composite bats provide better performance and are more durable than wood baseball bats.  As baseball bat performance has improved, the NCAA and NFHS have adopted various standards to regulate the performance of aluminum and composite baseball bats.  The NCAA and NFHS represent to the public that these standards are objective and neutral, that testing is conducted by credible independent laboratories, and that the standards are enforced in a nondiscriminatory way.

### A.      THE INHERENT UNRELIABILITY OF THE BBCOR STANDARD.

13.      Beginning in 2011, the NCAA began enforcing the NCAA Standard for Testing Baseball Bat Performance.   This standard requires that baseball bats utilized in NCAA sanctioned baseball games be certified by an authorized laboratory as having a Bat-Ball Coefficient of Restitution (BBCOR) of 0.500 or less (the BBCOR Standard).  A copy of the BBCOR Standard as adopted by the NCAA is attached as Exhibit 1 and incorporated by reference.

14.      The BBCOR Standard purports to quantify bat performance in a laboratory setting by shooting a ball through an air cannon at a stationary baseball bat and then measuring

numerous variables, including, among other things, how the ball reacts when the ball hits the bat.   The test is "complex," "experimentally challenging" and subject to error.

15.     The developers of the scientific protocols employed in the BBCOR Standard estimate an error rate of 1% to 3% and possibly higher.  Because of this uncertainty and other factors, the findings of one laboratory generally cannot be validated by a second laboratory and that WSU cannot even validate its own findings using the two air cannons in its laboratory.  It also means that data represented beyond the second decimal place is uncertain and inherently unreliable.   As such, any data represented after the second decimal point is inherently unreliable, uncertain and does not provide  meaningful information about bat performance or player safety.

16.     In short, the BBCOR Standard, as formulated by the NCAA, permits testing to be conducted without appropriate protocols, and for certification decisions to be made based on unreliable and faulty test results.  The NCAA had other options.   For example, in designing the BBCOR Standard, the NCAA could have fully adhered to the protocols suggested by independent standard setting agencies such as the ASTM for measuring bat performance. Instead, the NCAA departed from these protocols and failed to incorporate offsetting safeguards to ensure testing accuracy.   NFHS followed the NCAA in its decision and also agreed to adopt the BBCOR Standard.

**B.     THE EXCLUSIONARY EFFECTS OF THE BBCOR STANDARD.**

17.     The BBCOR Standard effectively insulates Incumbent Manufacturers from competition.   To compete effectively, new entrants like Marucci must introduce high performance bats which meet but do not exceed the 0.500 ceiling for certification because elite

{B0800923.1}                                            7

players draw performance distinctions between bats with a BBCOR of 0.49 and bats with a BBCOR of 0.50.   By adopting a standard and methodology that are demonstrably and inherently unreliable, the NCAA has made it impossible for new entrants to manufacture and market competitive aluminum and composite bats without being under a constant threat of decertification based on factors unrelated to the alleged purposes underlying the BBCOR Standard.

18.    The BBCOR Standard also excludes new entrants by giving Incumbent Manufacturers substantial cost advantages over new entrants.  Among other things, the BBCOR Standard permits baseball bat manufacturers to challenge the certification granted to bats manufactured by competitors by paying WSU to test the bats for compliance with the standard. Incumbent Manufacturers can, in fact, hand select specific bats and submit those bats to WSU for testing.  Although small entrants also are permitted to challenge competitive bats in theory, Incumbent Manufacturers collectively certify hundreds of bat models under the BBCOR Standard.  Easton, for example, has 94 BBCOR certified bats.  DeMarini has 59 certified bats. Louisville Slugger has 52 certified bats.  Rawlings has 27 certified bats.  Marucci, by contrast, had only seven certified bats following NCAA's opening day (2/17/12) decertifications. Incumbent Manufacturers also have access to design facilities and manufacturing plants which permit them to rapidly introduce and obtain certifications for new bat designs.  As such, challenging the bats of Incumbent Manufacturers would require a sustained effort over years and impose hundreds of thousands of dollars of costs on a new entrant.  Because the costs associated with sustaining such a program are prohibitive for almost any new entrant and disproportionately affect the average costs of a new entrant as compared to the effect on the

Case 3:12-cv-00223-BAJ-SCR   Document 61-1 *SEALED*   06/01/12   Page 8 of 23

average costs of an Incumbent Manufacturer, it is neither practicable nor feasible for small entrants to adopt a program to challenge competitive bats.

19.    Incumbent Manufacturers, on the other hand, have access to capital and existing internal testing laboratories which permit them to implement effective programs for challenging competitive bats. Incumbent Manufacturers further recognize that new entrants are particularly vulnerable to a program for challenging competitor bats because new entrants generally seek certification on only a handful of bat models and are unable to introduce new designs into the market rapidly should the NCAA decertify any of their bats. As such, the BBCOR Standard has created a perverse incentive for Incumbent Manufacturers to challenge the bats of new entrants and to not challenge the bats of other Incumbent Manufacturers.

C.    **THE ATTEMPT TO EXCLUDE MARUCCI FROM THE MARKETPLACE**

20.    In anticipation of the enforcement of the BBCOR Standard in 2011, Marucci had several aluminum bats certified under the BBCOR Standard over the course of 2010 and 2011. Based upon representations from WSU and NCAA that the Marucci bats were BBCOR compliant, Marucci incurred significant costs and expenses associated with manufacturing and marketing the bats. Collegiate and high school players also invested hundreds of hours of time practicing with the Marucci bats in anticipation of the 2012 season.

21.    On February 17, 2012, the opening day of the 2012 collegiate baseball season, the NCAA publicly announced that it had decertified the Cat52 33" based on compliance testing conducted in or about January 2012. On March 20, 2012, the NCAA notified Marucci that three other Marucci BBCOR certified bats—models identified as the Cat52 34" and Marucci MCB11 33"& 34"--had been compliance tested by WSU and failed to meet the BBCOR Standard.

22.     In conducting the compliance testing at the direction of the NCAA, WSU failed to adopt or follow appropriate necessary protocols for accurate testing.  Among other things, WSU did not attempt to obtain a representative sample of bats used in NCAA competition but rather tested bats hand selected by the NCAA.  WSU further failed to adopt or follow the protocols established by well-respected standard setting institutions such as ASTM International for BBCOR testing and failed to follow the protocols established by the BBCOR Standard.  By way of example, upon information and belief, WSU ignored protocols related to the weight tolerance for test balls, tolerances for inbound ball speed, rebound angles, and sequence of bat impact locations.

23.     Further, despite the claim that the Marucci bats failed to meet the BBCOR Standard, the test results prepared by WSU establish that the Marucci bats did not fail the BBCOR Standard.   The WSU test results exceeded the BBCOR ceiling of .500 by values ranging from .001 to .007.   These values, according to the developers of the protocols used in the BBCOR Standard, fall well within the range of uncertainty or imprecision for BBCOR testing and, therefore, did not constitute reliable evidence that any Marucci bat had exceeded the 0.500 ceiling of the BBCOR Standard.  Further, in order to conclude that Marucci MCB11 33' exceeded the 0.500 ceiling in its testing of three different bats, WSU rounded up the fourth decimal of its WSU calculations for its test on one of the bats even though it knew that carrying the calculation out to the fourth decimal was well beyond the reliability and precisions of its testing.

24.     Marucci appealed the finding that its bats did not meet the BBCOR Standard to the Baseball Rules Committee of the NCAA.  In connection with the appeal, BBCOR produced

Case 3:12-cv-00223-BAJ-SCR   Document 61-1 *SEALED*   06/01/12   Page 10 of 23

uncontradicted evidence that WSU had engaged in improper testing procedures, that WSU had employed a faulty methodology, and that the test results did not provide reliable evidence to support the conclusion that its bats failed to meet the BBCOR Standard. Despite this evidence, the Committee denied the appeal and a request for reconsideration of its appeal and Marucci is at imminent risk of having the NCAA decertify several BBCOR bat models.

### D.  THE COMPETITIVE HARM OF THE BBCOR STANDARD.

25.   Collegiate and high school baseball players spend significant amounts of money purchasing baseball bats and hundreds of hours practicing with and becoming accustomed to their selected baseball bats.   Forcing players to change their bat selection will have a detrimental effect on their performance which in turn will affect the placement of their teams in conference leagues and playoffs.  Individual performance also affects the likelihood that a player will be drafted and, if drafted, their placement within the draft.   With increasing frequency, players are selecting Marucci bats as their first, best choice over the bats of other manufacturers.

26.   By way of example, in 2011, Nike permitted colleges and universities with exclusive baseball bat contracts with Nike to use bat manufactured by other manufacturers as long as the college and universities did not accept promotional payments from those manufacturers.  Of the colleges and universities with Nike contracts targeted by Marucci, nearly all selected Marucci over the bats manufactured by Incumbent Manufacturers while the others were sufficiently impressed with Marucci to incorporate Marucci bats into their bat portfolios.

27.   The BBCOR Standard has the effect of denying players their preferred bat selection without providing any corresponding safety or competitive benefit by establishing a

ceiling carried out to an inherently unreliable third decimal point (i.e., 0.500), by rounding up an inherently unreliable fourth decimal point, by permitting the testing to be conducted in a manner that will lead to inherently unreliable results, by adopting a methodology that generates results which cannot be verified by other laboratories, by insulating Incumbent Manufacturers from competitive challenges while incentivizing those same Incumbent Manufacturers to challenge new entrants, and by requiring that all testing be conducted by WSU, a laboratory that lacks certification, independence, and operates under an inherent conflict of interest.

28.     The BBCOR Standard also harms competition because it has the purpose and effect of deterring and excluding new entry.  The entry of Marucci into the market for BBCOR certified aluminum and composite bats has caused the Incumbent Manufacturers to drop their prices in order to compete against the higher quality bats offered by Marucci.  By way of example, Marucci has received reports from retailers that Incumbent Manufacturers have been in a "panic" over Marucci.  Incumbent Manufacturers, including DeMarini and Easton, also have been forced to aggressively slash their prices as their inventories have risen due to increased sales by Marucci.  If permitted to remain in place, the BBCOR Standard will eliminate Marucci from the marketplace and, in turn, eliminate the price competition Marucci has generated as well as the incentive of Incumbent Manufacturers to improve bat quality.

### E.     THE ECONOMIC MOTIVE FOR THE BBCOR STANDARD.

29.     As implemented by the NCAA, NFHS, and WSU, the BBCOR Standard has the effect of discouraging new entrants and protecting their financial interest by assuring the success of Incumbent Manufacturers.  Each derives a substantial financial benefit from the

{B0800923.1}                          12

Incumbent Manufacturers in the form of payments made by the Incumbent Manufacturers under licensing and promotional agreements.  By way of example, colleges and universities routinely enter into exclusive equipment and apparel agreements with the Incumbent Manufacturers under which the Incumbent Manufacturers pay colleges and universities and their coaches hundreds of thousands of dollars to utilize their equipment and/or apparel.

30.    New entrants like Marucci represent a direct threat to these relationships because they generate complaints from Incumbent Manufacturers who may withhold or reduce their payments.  Colleges and universities also will not be able to maintain their contracts if their players start demanding that they be permitted to utilize bats manufactured by firms other than the Incumbent Manufacturers.  Instead, in the absence of the agreement to exclude new entrants reflected by the BBCOR Standard, the NCAA and NFHS and their member institutions would have an incentive to adopt a standard that had the effect of protecting player safety, increasing price competition, and improving quality.  The member institutions also would have an incentive to select the highest performance bats in order to attract the highest quality recruits and improve team performance.  The BBCOR Standard permits the NCAA and the NFHS and their respective member institutions to ignore these incentives and select bats from Incumbent Manufacturers who are making substantial payments to them.

**FIRST CAUSE OF ACTION:  VIOLATION OF SECTION ONE OF THE SHERMAN ACT**

31.    Beginning no later than January 2011, and continuing to the present, Defendants have engaged in a conspiracy and agreement in unreasonable restraint of interstate trade and commerce, constituting a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  This offense is likely to continue and recur unless the relief requested by Marucci is granted.

32. The conspiracy and agreement consist of an understanding and concert of action among the defendants to enforce the BBCOR Standard with the purpose and effect of excluding new entrants and insulating Incumbent Manufacturers from competition in a relevant market. The relevant product market is BBCOR certified aluminum and composite baseball bats. The anticompetitive acts described above directly affect the sale of BBCOR certified aluminum and composite baseball bats and there are no reasonable alternatives to such bats as wood baseball bats do not in the view of consumers perform as well and are less durable than aluminum and composite baseball bats. Players will not switch to wood bats even if manufacturers imposed and sustained a significant price increase on BBCOR certified aluminum and composite bats. Further, manufacturers and retailers view and treat aluminum and composite bats as a separate market segment from wood bats. The relevant geographic market is the United States. Baseball bat manufacturers distribute and sell their bats nationwide. The BBCOR Standard also is applied by the NCAA and NFHS at schools in all fifty states.

33. Defendants possess market power in the market for BBCOR certified aluminum and composite bats because the NCAA is the sole sanctioning body for athletic events at member universities and colleges and promulgated the BBCOR Standard and the NFHS is the sole sanctioning for athletic events at member high schools and adopted the BBCOR Standard.

34. The market for BBCOR certified aluminum and composite bats is highly concentrated with the Easton, DeMarini, Louisville and Rawlings collectively issuing in excess of 80% of the total number of certified BBCOR bat models and, upon information and belief, a similar share of total bat sales. Entry into the market is difficult due to high entry barriers created by the BBCOR Standard and by the significant sunk costs necessary to engage in the

Case 3:12-cv-00223-BAJ-SCR Document 61-1 *SEALED* 06/01/12 Page 14 of 23

development, manufacturing, and distribution of aluminum and composite bats. In order to compete successfully, bat manufacturers also must establish goodwill among consumers and retailers and such goodwill often requires years to establish and can be easily lost.

35.    The agreement and concerted action among the defendants has had and will continue to have anticompetitive effects, including, without limitation, eliminating consumer choice, constraining innovation, restraining price competition for, and increasing the retail prices of, aluminum and composite bats, eliminating competition among Incumbent Manufacturers, entrenching Incumbent Manufacturers by insulating them from competition from new entrants, and increasing the likelihood that Incumbent Manufacturers will enter into tacit or express agreements to collude with respect to aluminum and composite bats. Further, this concerted action has not had and will not have any procompetitive objective or effects or, alternatively, its scope is broader than necessary to accomplish any procompetitive objective.

36.    The agreement and concerted action among the defendants and its anticompetitive effects has caused, and will continue to cause, injury to Marucci unless restrained. Marucci will be, at best, competitively disadvantaged by the agreement and, in all likelihood, will be excluded from the market entirely.  Marucci is disadvantaged because the BBCOR Standard creates substantial cost advantages for Incumbent Manufacturers and incentivizes Incumbent Manufacturers to target the bats of new entrants for decertification and to not target the bats of other Incumbent Manufacturers. The BBCOR Standard effectively prevents or, at the very least, discourages new entrants from manufacturing bats that are competitive with those produced by the Incumbent Manufacturers.  As such, the BBCOR

Standard operates as an artificial barrier to entry restricting the ability of Marucci and other small entrants to compete effectively and diminishing competition in general.

37.     Unless the violation is restrained, Marucci will be forced to abandon a high quality product and produce a noncompetitive bat which will prevent Marucci from competing with the Incumbent Manufacturers.  The goodwill that Marucci has developed with players and retailers also will be permanently destroyed as players and retailers will be unwilling to risk further decertifications due to the significant costs that they will incur when they are forced to switch to new bat models.  Finally, enforcement of the BBCOR Standard will effectively exclude Marucci from the market for months.   Marucci is entitled to permanent injunctive relief pursuant to 15 U.S.C. § 26.

38.     The injury to consumers also is irreparable.  Forcing players to change their bat selection will have a detrimental effect on their performance which in turn will affect the placement of their teams in conference leagues and playoffs.  It also will affect the likelihood that a player will be drafted and, if drafted, their placement within the draft.  Marucci is entitled to permanent injunctive relief pursuant to 15 U.S.C. § 26.

39.     Marucci also has suffered monetary damages as a direct and proximate consequence of the agreement and concerted action among the defendants and its anticompetitive effects.  Among other things, through their conduct, defendants have imposed operational expenses on Marucci which it would not otherwise have incurred, restrained the ability of Marucci to capture additional market share for bat sales, caused Marucci to lose sales, damaged Marucci's reputation and business valuation, and prevented Marucci from expanding

its business lines and pursuing other opportunities.  Marucci is entitled to recover its damages

threefold plus its reasonable attorneys' fees and interest pursuant to 15 U.S.C. §§ 15(a), 26.

## SECOND CAUSE OF ACTION:  LOUISIANA ANTITRUST CLAIM

40.     Beginning no later than January 2011, and continuing to the present, defendants

have engaged in a conspiracy and agreement in unreasonable restraint of trade and commerce

in Louisiana, constituting a violation of Louisiana Revised Statute §§ 51:122, 124  This offense is

likely to continue and recur unless the relief requested by Marucci is granted.

41.     The parameters of a violation Louisiana Revised Statute §§ 51:122, 124 are co-

extensive with the prohibition against unreasonable restraints in trade and commerce under

Section 1 of the Sherman Act, 15 U.S.C. § 1.   Marucci, therefore, restates and incorporates by

reference its allegations against defendants as set forth in the First Cause of Action and seeks

injunctive relief, attorneys' fees and damages pursuant to LA-R.S. §§ 51:129, 136, 137.

## THIRD CAUSE OF ACTION:  UNFAIR TRADE PRACTICES

42.     Defendants have, as fully described above, engaged in a pattern of misconduct,

misrepresentations, and unreasonable restraints of trade, including, without limitation,

conspiring to exclude Marucci from the marketplace through misrepresentations and

misstatements about its compliance with the BBCOR Standard, eliminate consumer choice,

constrain innovation, restrain price competition for, and increase the retail prices of, aluminum

and composite bats, eliminate competition among Incumbent Manufacturers, and entrench

Incumbent Manufacturers by insulating them from competition from Marucci.   These acts,

individually and collectively, represents unfair trade practices and have imposed operational expenses on Marucci which it would not otherwise have incurred, restrained the ability of Marucci to capture additional market share for bat sales, caused lost sales, damaged Marucci's reputation and business valuation, and prevented Marucci from expanding its business lines and pursuing other business opportunities.  Marucci is entitled to recover these damages plus its reasonable attorneys' fees and interest pursuant to LA-R.S. § 51:1409.

## FOURTH CAUSE OF ACTION:  PRODUCT DISPARAGEMENT

43.    Defendants have, as fully described above, disparaged and intend to disparage Marucci and its aluminum and composite bats by claiming that Marucci's aluminum and composite bats do not satisfy the BBCOR Standard and are less safe than the bats of Incumbent Manufacturers.  Defendants, at all times, knew or should have known that their statements were false and that they would damage Marucci. Defendants made the statements in bad faith and with malice because Marucci and its success threatened their financial interests.  These acts have imposed operational expenses on Marucci which it would not otherwise have incurred, restrained the ability of Marucci to capture additional market share for bat sales, caused lost sales, damaged Marucci's reputation and business valuation, and prevented Marucci from expanding its business lines and pursuing other business opportunities.  Marucci is entitled to recover these damages under Louisiana law and is further entitled to injunctive relief because many of its injuries are irreparable will continue unless restrained.

## FIFTH CAUSE OF ACTION:  TORTIOUS MISCONDUCT

44.    Defendants owed a duty to Marucci to adopt and implement standards that were objective and neutral and to treat Marucci in the same manner in which it treated other

bat manufacturers with respect to certification of aluminum and composite bats under the BBCOR Standard.   The conduct described above constitutes intentional or, alternatively, negligent breach of these duties and caused and continues to cause injury and damage to Marucci in the form of economic loss, damage to reputation, and diminished business valuation.  Marucci is entitled to recover its damages under Louisiana law and is further entitled to injunctive relief because many of its injuries are irreparable will continue unless restrained.

### SIXTH CAUSE OF ACTION:  MISREPRESENTATION AND DETRIMENTAL RELIANCE

45.     NCAA and WSU knowingly and intentionally represented orally and in writing to Marucci that the BBCOR Standard and certification procedures established by the NCAA and WSU were objective and neutral standards and protocols for measuring bat performance and protecting player safety.   NCAA and WSU further represented orally and in writing that the Marucci bats were BBCOR compliant.  Marucci relied on these representations to its detriment by participating in the certification process and investing millions of dollars in manufacturing and marketing its BBCOR certified aluminum and composite bats believing that the NCAA and WSU had acted honestly and in good faith.  The representations by the NCAA and WSU have proved to be false and, as fully described above, were always known by the NCAA and WSU to be false.  This conduct has caused Marucci to incur operational expenses which it would not otherwise have incurred, restrained the ability of Marucci to capture additional market share for bat sales, caused lost sales, damaged Marucci's reputation and business valuation, and prevented Marucci from expanding its business lines and pursuing other business opportunities.  Marucci is entitled to recover these damages under Louisiana law and is further entitled to injunctive relief because its injuries will continue unless restrained.

**SEVENTH CAUSE OF ACTION:  INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONS**

46.     Defendants have engaged, as more fully described above, in a pattern of misconduct, misrepresentations, and unreasonable restraints of trade, including, without limitation, conspiring to exclude Marucci from the marketplace through misrepresentations and misstatements about its compliance with the BBCOR Standard, eliminate consumer choice, constrain innovation, restrain price competition for, and increase the retail prices of, aluminum and composite bats, eliminate competition among Incumbent Manufacturers, and entrench Incumbent Manufacturers by insulating them from competition from Marucci.  These acts were intended to interfere with and disrupt the business relationships between Marucci and its customers and retailers.  Defendants were at all times aware of these business relationships and intended to disrupt them.  In doing so, defendants have imposed operational expenses on Marucci which it would not otherwise have incurred, restrained the ability of Marucci to capture additional market share for bat sales, caused lost sales, damaged Marucci's reputation and business valuation, and prevented Marucci from expanding its business lines and pursuing other business opportunities.  Marucci is entitled to recover these damages under Louisiana law and is further entitled to injunctive relief because its injuries will continue unless restrained.

WHEREFORE, Marucci prays for a trial by jury and that after due proceedings:

1.  That this Court grant it permanent injunctive relief prohibiting the NCAA, NFHS, and their officers, agents, servants, employees, and successors and all other persons or claiming to act in active concert or participation with them from decertifying or refusing to certify any Marucci bats unless the BBCOR compliance test score exceeds 0.522 or such other variance as the Court determines is appropriate;

2.  That this Court grant it a permanent injunction prohibiting the NCAA, NFHS, and their officers, agents, servants, employees, and successors and all other persons or claiming to act in active concert or participation with them from enforcing the

BBCOR Standard, or any part thereof deemed to be an unlawful restraint, and from continuing or maintaining the conduct alleged herein, and from engaging in any other conduct, combination, conspiracy, agreement, understanding, plan, program or other arrangement having the same effect as the conduct alleged herein;

3. That this Court issue a permanent injunction prohibiting the NCAA and NFHS and their officers, agents, servants, employees, and successors and all other persons or claiming to act in active concert or participation with them from operating, using or relying on any unaccredited testing facility  or any testing facility for bat performance unless in compliance with the protocols established by ASTM International or an equivalent independent standard setting body in connection with the enforcement of the present or any future BBCOR Standard;

4. That this Court enter a judgment awarding damages in favor of Marucci and against the NCAA and NFHS for all past, present and future economic losses sustained by Marucci as a result of the conduct of NCAA and, NFHS and that it treble this damage award pursuant to 15 U.S.C. § 15(a);

5. That the Court award prejudgment interest, post judgment interest, reasonable attorneys' fees, expert witness fees, and costs and such other and further relief as may be appropriate and as the Court may deem just and proper.

Respectfully submitted,

/s/ Kevin O. Ainsworth
William L. Schuette (La. Bar Roll #2098)
James C. Percy (La. Bar Roll #10413)
Kevin O. Ainsworth (La. Bar Roll # 26777)
David Borghardt (La. Bar Roll #32351)
Caroline Parenton (La. Bar Roll #33308)
Jones, Walker, LLP
8555 United Plaza Blvd., 5th Floor
Baton Rouge, Louisiana   70809
kainsworth@joneswalker.com
Telephone:  (225) 248-2036
Facsimile:  (225) 248-3136

with

David G. Radlauer (La. Bar Roll #11058)
Mark A. Cunningham (La. Bar Roll # 24063)
Jones, Walker, LLP

201 St. Charles Ave.
New Orleans, Louisiana 70170
mcunningham@joneswalker.com
Telephone: (504) 582-8000
Fax: (504) 589-8536

and

Jay K. Reisinger, Esquire
Pennsylvania Bar No. 78743
FARRELL & REISINGER, LLC
Suite 200 – Koppers Building
Pittsburgh, PA 15219
jreisinger@farrellreisinger.com
(412) 894-1380
(412) 894-1381 (facsimile)

*Attorneys for Plaintiff, Marucci
Sports, L.L.C.*


## CERTIFICATE OF SERVICE

I certify that on this day, a true and correct copy of the foregoing pleading was filed with

the United States Middle District Court of Louisiana.  Notice of this filing will be sent to the

following counsel by operation of the court's electronic filing system:

-None-

I also certify that I have mailed a copy of this filing to the following non-CM/ECF

participants, by U.S. Mail, postage prepaid and properly addressed:

National Collegiate Athletic
Association ("NCAA")
Through attorneys of record
Philip D. Bartz
Rebecca Nelson
Bryan Cave, LLP
1155 F Street, N.W.
Washington, DC 20004

National Collegiate Athletic
Association ("NCAA")
Through attorneys of record
Christine Lipsey
McGlinchey Stafford, P.L.L.C.
301 Main Street
One American Place 14th Floor

{B0800923.1}

22

Baton Rouge, LA 70825

National Federation of High
Schools ("NFHS")
Through attorneys of record
Greg Bentz
Twelve Wyandotte Plaza
120 W. 12th Street
Kansas City, MO 64105

National Federation of High
Schools ("NFHS")
Through attorneys of record
Michael D. Hunt
Phelps Dunbar LLP
II City Plaza, Suite 1100
400 Convention Street
Post Office Box 4412
Baton Rouge, LA 70821-4412

Baton Rouge, Louisiana, this 1st day of June, 2012.

s/ Kevin O. Ainsworth
Kevin O. Ainsworth